Mrs. Sarah Lou P. MOSES, etc., et al., Appellants,

v.

CENTRAL LOUISIANA ELECTRIC COMPANY, Inc., et al., Appellees.

No. 19600.

United States Court of Appeals Fifth Circuit.

Oct. 30, 1963.

Rehearing Denied Dec. 16, 1963.

H. Alva Brumfield, Sylvia Roberts, Baton Rouge, La., for appellants.

W. Ford Reese, Richard C. Baldwin, New Orleans, La., David W. Robinson, Baton Rouge, La., Adams & Reese, New Orleans, La., for Michigan Mut. Liability Co.

Jacob S. Landry, Jack J. Cousin, Iberia, La., for Central La. & Elec. Co., Inc.

Alvin R. Christovich, Sr., New Orleans, La., Christovich & Kearney, New Orleans, La., for R. S. Woodruff and State Automobile and Cas. Underwriters.

John V. Baus, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for R. D. Cooper, d/b/a R. D. Cooper Const. Co. and Liberty Mut. Ins. Co.

Deutsch, Kerrigan & Stiles, New Orleans, La., for Continental Cas. Co., Ralph L. Kaskell, Jr., New Orleans, La., of counsel.

Before RIVES and CAMERON, Circuit Judges, and BOOTLE, District Judge.

CAMERON, Circuit Judge.

About five thirty P.M. November 8, 1957, Louis D. Newton was piloting an amphibious plane carrying as his passenger Robert L. Moses, both being employees of an oil corporation who were returning to their homes after the day's work. Newton was planning to land his plane adjacent to Slaton's Seaplane Base. Both the pilot and passenger were killed when the plane was flown into one of the transmission wires owned and maintained by Central Louisiana Electric Company, Inc. (CLECO), which crossed the Intracoastal Waterway near the town of Ramos, Louisiana, which wires were suspended between two towers owned and maintained by the Company. The crossing was at a point sixth-tenths of a mile from Slaton Seaplane Base at which the pilot intended to land, and nine-tenths of a mile from another seaplane base situated in the opposite direction from the Slaton Base.

A civil action was brought by the widow and children of each of the decedents against CLECO and its insurer Michigan Mutual Liability Company and against R. S. Woodruff. Several others were joined as defendants,[1] but were eliminated by orders of the trial court. The lower court consolidated the two civil actions for trial, and they were submitted upon special interrogatories to the jury. The jury answered that CLECO was negligent, but that its negligence was not a proximate cause of the accident; that Woodruff was not negligent; that Newton was negligent and that his negligence was a proximate cause of the accident. No interrogatory was submitted as to whether Moses was negligent. Based upon the jury's answers to the interrogatories, the lower court entered judgment in favor of all defendants. Motions for new trial were heard and denied.

All plaintiffs appealed, specifying as error that the trial court erred in failing to set aside the jury's finding that Newton was negligent, and that his negligence was a proximate cause of the accident; in failing to set aside the jury's finding that CLECO's negligence was not the proximate cause on the ground that the finding was contrary to the manifest weight of the evidence and resulted from erroneous, misleading instructions; in failing to set aside the jury's finding that Woodruff was not negligent, and in failing to set aside the jury's verdict and grant recovery for the death of Moses and Newton.

The court below heard some two dozen witnesses, and the evidence was conflicting as to some of the crucial questions and was without conflict as to others. We will refer to the evidence the jury

---

1. The parties will, in most instances, be referred to as they were aligned in the court below.

was justified in accepting as the basis of its findings. Eye witnesses to the accident testified that the plane approached the point of collision at an altitude of about six hundred feet from the water with its clearance light and rotating beacon on. Others on the highway paralleling the canal and near Slaton Seaplane Base saw the plane approaching in a westerly direction to make a landing on the water and the plane seemed to have dropped to about the height of the towers. One witness on the highway, arrived at a point opposite the collision after having seen the plane stop in mid air accompanied by a flash, observed the plane in the water and one transmission wire broken. A witness, Hare, chief pilot for Slaton Seaplane Service, had made a landing in the waterway upon his return to the Slaton Base about ten minutes ahead of Newton, and the two had been in radio communication. Hare had used the same method of approach which was followed by Newton. Both had dropped to near tree level height, proceeding into the west-north-west wind, and Hare had gone under the CLECO wires, which Newton was manifestly proceeding to do at the time of the collision. That was a customary route of approach to the Slaton Base.

The Slaton Base was established in 1953 and, by 1955, had about fifteen planes per day taking off or landing. In 1956, Dan Slaton, the owner, was issued an air carrier's certificate authorizing him to operate as an air taxi operator and certifying that Slaton Seaplane Base had met the regulations and standards applicable thereto. CLECO began making surveys for the location of its transmission lines in 1954. Its application to the Civil Aeronautics Administration dated October, 1955, stated that it knew of no landing areas adjacent to the proposed lines. Slaton wrote CLECO March 12, 1956 requesting the installation of extra markings on the wires in order to make them easier to see, stating that

they were a hazard to air traffic using his seaplane base.

Construction of the transmission line was begun in the early part of 1956, the towers being completed in January, 1957, at which time the wires were stretched between the two towers standing on the opposite sides of the waterway. The eight strands of wire ranged from eight to twenty feet apart, with a space of about thirty-six feet between the top and bottom wires. The towers were two hundred fourteen feet high and twelve hundred fifty feet apart. No lights were placed upon them, nor were they painted orange and white in alternating stripes as required by the CAA-FAA Manual. The Manual also required overhead wires to be protected by objects spherical in shape with a diameter of not less than twenty inches. There was evidence that there were two less than the required number of these balls on the wire which carried them. A close examination of the nine enlarged photographs in evidence, taken from an airplane at the time when visibility was said to approximate that when the accident happened, shows six balls which appear to be on the top wire only. In general, the pictures with the sky as background do not show the presence of any wires beyond the one upon which the balls were suspended.[2]

All of the evidence about requirements as to such structures and the practices in that area was the subject of some dispute; but, on the whole, it seems to be accepted by all parties that the installation of the towers and wires did not comply with the requirement of government agencies and the jury found that CLECO was negligent. The defendants sought to escape responsibility for this failure by showing that the pilot Newton made frequent use of the approach route under these wires and was familiar with their location; and by contending that he ought to have circled the landing base to

2. We know judicially that sunset at the point of accident was 5:12 and the evidence shows that the collision took place about twenty minutes later and that the plane was proceeding away from the afterglow.

determine whether water traffic was in close proximity to the wires before using that course for his landing.

■ The court below gave the jury a lengthy and, on the whole, explicit charge, but we think that it committed reversible error in several particulars. The question of whether the negligence of CLECO, in the installation and maintenance of these wires at a point where frequent use was made of the airways by planes landing and taking off, was a proximate cause of the accident loomed large in the minds of court and jury. The confusion of the jury on this issue was manifested by its return to the courtroom for further instruction with respect to it. Through the foreman it propounded two requests: that the Court "reread charge quoting negligence by more than one party"; and "define 'a proximate cause of the accident.'" The trial court proceeded to respond as best it could, replying to the jury in part as follows:

"Now, with reference to a proximate cause of the accident you have put your finger on one of the most difficult definitions in the law. This determination is one which peculiarly calls upon genius of the jury system, and human experience, in making a determination as to what is actually the proximate cause or causes. * * *

"Now in the charge I read you a definition of proximate cause, and it reads as follows: I charge you further that in the eyes of the law negligence is actionable only when it is the proximate cause of the injury received. That is to say, *where the negligence proceeds in an unbroken chain without independent intervening cause up to the point of causing the accident or precipitating the accident.* Now, that is about as good a definition of proximate cause as you can get. * * *" [Emphasis added.]

The trial court had, in its initial charge and after it had completed its regular charge, given two instructions requested by the defendant CLECO:

"Unless you find that CLECO was guilty *of an act of negligence* which directly and proximately caused or contributed to the accident, your verdict should be one of no negligence for CLECO, or no proximate cause, if you do find negligence. * * *

"Even if you should find that CLECO was negligent, if you also find that *its negligence had become passive or static and that the negligence of another brought about the conditions which caused the accident,* then your verdict should be for CLECO, or that it was not negligence or not the proximate cause." [Emphasis added.]

These requested instructions, we hold under the facts of this case, should not have been given. Together with the response given to the questions propounded by the jury, they serve to distort and draw out of focus the duty which the law placed upon CLECO. The emphasis upon negligence as *an act* and upon the requirement that it "directly" and "proximately" caused or contributed to the accident, coupled with the instruction that CLECO would be absolved of liability if its negligence had become passive or static; and if the negligence of another brought about the conditions which caused the accident, was calculated to acquit CLECO of its proven and jury-accepted negligence in maintaining the wires at a point where it knew planes customarily passed over and under them without taking precautions adequate to the surrounding circumstances. The charge as a whole seems to leave the definite impression that the passive and static presence of the wires was not to be considered as negligence if Newton chose to approach the landing under and in close proximity to them, as was the custom.

The Supreme Court of Louisiana, in the recent case of Dixie Drive It Yourself System v. American Beverage Co., 1962, 137 So.2d 298, 307, reviewed a large num-

ber of Louisiana cases dealing with passive negligence and restricted the scope of immunity arising from that doctrine. It said in the latter portion of the opinion:

"It appears futile to attempt a reconciliation of these and other cases dealing with actions by third parties arising from collisions between a moving and stationary vehicle. This is rendered difficult by the ambiguity of the language of proximate cause. As employed by [the] courts, proximate cause is a legal concept without fixed content. It is used indiscriminately to refer to cause-in-fact, the scope of liability, and other negligence factors. * * *

"The doctrine of passive negligence, as stated in them, places undue emphasis on the *chronology of the negligent acts and omissions. In so doing it insulates the first wrongdoer from liability to innocent victims.* * * *

"The traffic congestion and advancing speed of recent years have added to * * * [the] danger." [Emphasis added.]

Dixie Drive It Yourself has proven to be a "guideline" case, being cited more than a dozen times in opinions of the appellate courts of Louisiana. The Court of Appeals [3] cites it as authority for the principle that "the concept of passive negligence is not recognized in Louisiana law to defeat the claim of an innocent tort victim." [4]

The principles discussed in these cases apply with particular force to the obstruction of air lanes known to be subject to frequent use unless all of the requirements of the law and of reasonable care are observed. Those approaching the landing were entitled to have the benefit of all warning objects required by government regulations or the rules of reasonable care. For these reasons, we think that the charge as a whole was obscure and confusing on the important question of proximate cause; and that it was rendered more so by the inclusion of the two quoted instructions given at the request of CLECO, and that the case as to CLECO should be reversed and remanded for a new trial.

We have concluded that the finding of the jury that Woodruff was not negligent is supported by the evidence and the decisions of the Louisiana courts. At most, the evidence showed that Woodruff, the agent of CLECO, was guilty of nonfeasance in the performance of the contract between them, and was not guilty of a breach of duty owed by him to the plaintiffs.[5] First Federal S. & L. Association v. Continental Equity Life Insurance Co., Ct.App.La.1960, 124 So.2d 802, and Southwestern Sugar and Molasses Co. v. Industrial Molasses Corp., Ct.App.La., 1961, 135 So.2d 481.

We suggest that, on another trial, the district court take particular note of whether any contributory negligence on the part of decedent Moses was shown. We think that proof on this point is meager indeed, and that it is very doubtful from the record before us whether Moses was chargeable with the contributory negligence of Newton if such should be proven. We suggest, also, that, on another trial, the district court take particular note of the evidence to see whether an appropriate charge on the question of sudden emergency should be given.

The judgment of the court below as to defendant Woodruff is affirmed; the judgment as to the defendant CLECO and its insurer is reversed and the cause remanded for a new trial.

Affirmed in part and reversed and remanded in part.

---

3. Steagall v. Houston Fire & Casualty Ins. Co., 1962, 138 So.2d 433.

4. And see also Bertrand v. Trunk Line Gas Co., Ct.App.La.1963, 149 So.2d 152, 154; Vosbein v. Arras, Ct.App.La., 1963, 149 So.2d 727.

5. On May 16, 1963, a judgment was entered in favor of appellees Continental Casualty Company, Liberty Mutual Insurance Company, and R. D. Cooper, d/b/a R. D. Cooper Construction Co., pursuant to agreement of counsel for the respective parties.